FILED

2018 JAN 26 PM 2: 19

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

FULL NAME
Vahe Sarkiss
COMMITTED NAME (if different)

FULL ADDRESS INCLUDING NAME OF INSTITUTION
1535 Sierra Highway

Acton, California 93510
PRISON NUMBER (if applicable)
Plaintiff In Pro Se

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAHE SARKISS,<br><br>PLAINTIFF,<br><br>v.<br><br>JAN W. DUNCAN, M.D., et. al.<br><br>DEFENDANT(S). | CASE NUMBER   CV-17-06866-VAP-(DFM)<br><br>*To be supplied by the Clerk*<br>FIRST AMENDED COMPLAINT<br><br>**CIVIL RIGHTS COMPLAINT**<br>**PURSUANT TO** *(Check one)*<br>☐ 42 U.S.C. § 1983<br>☒ Bivens v. Six Unknown Agents 403 U.S. 388 (1971) |

## A.  PREVIOUS LAWSUITS

1.  Have you brought any other lawsuits in a federal court while a prisoner: ☐ Yes   ☒ No

2.  If your answer to "1." is yes, how many? ____N/A____

   Describe the lawsuit in the space below.  (If there is more than one lawsuit, describe the additional lawsuits on an attached piece of paper using the same outline.)

ORIGINAL

a.  Parties to this previous lawsuit:
Plaintiff _____

_____

Defendants _____

_____

b.  Court _____

_____

c.  Docket or case number _____

d.  Name of judge to whom case was assigned _____

e.  Disposition (For example:  Was the case dismissed?  If so, what was the basis for dismissal?  Was it
appealed?  Is it still pending?) _____

f.  Issues raised: _____

_____

_____

_____

g.  Approximate date of filing lawsuit: _____

h.  Approximate date of disposition _____

## B.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

1.  Is there a grievance procedure available at the institution where the events relating to your current complaint
occurred? ☐ Yes   ☐ No    N/A    Released on Home Confinement

2.  Have you filed a grievance concerning the facts relating to your current complaint? ☐ Yes   ☒ No

If your answer is no, explain why not ___Not discovered until released from prison on
home confinement and medical records were obtained and reviewed.
_____

3.  Is the grievance procedure completed? ☐ Yes   ☐ No

If your answer is no, explain why not _____
_____

4.  Please attach copies of papers related to the grievance procedure.

## C.  JURISDICTION

This complaint alleges that the civil rights of plaintiff __Vahe Sarkiss_____
(print plaintiff's name)

who presently resides at __(Home Confinement) 1535 Sierra Highway, Acton, California 93510__,
(mailing address or place of confinement)

were violated by the actions of the defendant(s) named below, which actions were directed against plaintiff at

__Metropolitan Detention Center, Los Angeles, FCI Lompoc, and FCI Terminal Island,__
(institution/city where violation occurred)
California.

on (date or dates) __beginning May 2010, through December 2016.__ _____.
                   (Claim I)                (Claim II)                (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1.  Defendant  __Jan W. Duncan, M.D.__ _____ resides or works at
             (full name of first defendant)
             711 West College Street, Suite 625, Los Angeles, California 90012
             (full address of first defendant)      Alternate Address:  1700 East Cesar Chavez Ave.,
             BOP Contract Doctor                 Suite 3100, Los Angeles, CA 90033
             (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual    ☒ official capacity.

    Explain how this defendant was acting under color of law:
          See Attached Allegations

2.  Defendant  __Ramadas Abboy, M.D.__ _____ resides or works at
             (full name of first defendant)
             1700 East Cesar E. Chavez Avenue, Suite 3100, Los Angeles, CA 90033
             (full address of first defendant)

             (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual    ☒ official capacity.

    Explain how this defendant was acting under color of law:
          See Attached Allegations

3.  Defendant  __Hao Wei Zhang, M.D.__ _____ resides or works at
             (full name of first defendant)
              1700 East Cesar E. Chavez Avenue, Suite 3100, Los Angeles, CA 90033
             (full address of first defendant)

             (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual    ☒ official capacity.

    Explain how this defendant was acting under color of law:
          See Attached Allegations

on (date or dates) ___ beginning May 2010, through December 2016. _____.
　　　　　　　　　　　　　 (Claim I)　　　　　　　　 (Claim II)　　　　　　 (Claim III)

NOTE:　　You need not name more than one defendant or allege more than one claim. If you are naming more than
　　　　　　five (5) defendants, make a copy of this page to provide the information for additional defendants.

4.  Defendant　White Memorial Hospital _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　　1700 East Cesar E. Chavez Avenue, Suite 3100, Los Angeles, CA 90033
　　　　　　　　(full address of first defendant)

　　　　　　　　_____
　　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual　　☒ official capacity.

Explain how this defendant was acting under color of law:

　　　　　　See Attached Allegations _____

_____

5.  Defendant　Mike Chen, M.D. _____ resides or works at
　　　　　　　　(full name of first defendant)

　　　　　　　　City of Hope, 1500 East Duarte Road
　　　　　　　　(full address of first defendant)
　　　　　　　　　　　　　　　　　　Alternate Address: 209 Fair Oaks Avenue
　　　　　　　　　　　　　　　　　　　　　　　　　　 South Pasadena, California 91030
　　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual　　☒ official capacity.

Explain how this defendant was acting under color of law:

　　　　　　See Attached Allegations _____

_____

6.  Defendant　City of Hope Medical Center _____ resides or works at
　　　　　　　　(full name of first defendant)
　　　　　　　　1500 East Duarte Road, Duarte, California 91010
　　　　　　　　(full address of first defendant)

　　　　　　　　_____
　　　　　　　　(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual　　☒ official capacity.

Explain how this defendant was acting under color of law:

　　　　　　See Attached Allegations _____

_____

on (date or dates) _beginning May 2010 through December 2016._ _____.
                              (Claim I)              (Claim II)                    (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than
         five (5) defendants, make a copy of this page to provide the information for additional defendants.

7.  Defendant _Roger Satterthwaite, M.D._____ resides or works at
              (full name of first defendant)    Huntington Memorial Hospital
              _209 Fair Oaks Avenue, South Pasadena, California 91030_
              (full address of first defendant)

              _____
              (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual    ☒ official capacity.

    Explain how this defendant was acting under color of law:
              See Attached Allegations
    _____
    _____

8.  Defendant _Huntington Memorial Hospital_____ resides or works at
              (full name of first defendant)
              _100 West California Boulevard, Pasadena, California 91105_
              (full address of first defendant)

              _____
              (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual    ☒ official capacity.

    Explain how this defendant was acting under color of law:
              See Attached Allegations
    _____
    _____

9.  Defendant _Christopher Smith, M.D._____ resides or works at
              (full name of first defendant)
              _1300 West 7th Street, San Pedro, California 90732_
              (full address of first defendant)

              _____
              (defendant's position and title, if any)

    The defendant is sued in his/her (Check one or both): ☒ individual    ☒ official capacity.

    Explain how this defendant was acting under color of law:
              See Attached Allegations
    _____
    _____

on (date or dates) __beginning May 2010, through December 2016.__ , _____.
                   (Claim I)                  (Claim II)             (Claim III)

NOTE:     You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

10. Defendant   __Providence Little Company of St. Mary Hospital__    resides or works at
              (full name of first defendant)
              __1300 West 7th Street, San Pedro, California 90732__
              (full address of first defendant)

              (defendant's position and title, if any)

     The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

     Explain how this defendant was acting under color of law:
          See Attached Allegations

11.  Defendant  __David Zellman , M.D.__    resides or works at
             (full name of first defendant)
             __22 South Greene Street, Room N2E23, Dept. of Radiology, Baltimore MD 21201__
             (full address of first defendant)

             (defendant's position and title, if any)

     The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

     Explain how this defendant was acting under color of law:
          See Attached Allegations

12. Defendant  __Evelyn G. Castro, M.D.__    resides or works at
             (full name of first defendant)
             __Federal Correctional Institution, 1299 South Seaside Ave.__, San Pedro CA 9073?
             (full address of first defendant)
             Clinical Medical Director
             (defendant's position and title, if any)

     The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

     Explain how this defendant was acting under color of law:
          See Attached Allegations

on (date or dates) ___beginning May 2010, through December 2016.___ .
                            (Claim I)             (Claim II)              (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

13.  Defendant  ___Marcus Aird___ resides or works at
                   (full name of first defendant)
        ___Federal Correctional Institution, 1299 S. Seaside Ave., San Pedro, CA 90733___
        (full address of first defendant)
        ___Physician's Assistant___
        (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:
        See Attached Allegations

14.  Defendant  ___Mahesh Patel___ resides or works at
                   (full name of first defendant)
        ___Federal Correctional Institution, 1299 S. Seaside Ave., San Pedro, CA 90733___
        (full address of first defendant)
        ___Health Services Administrator___
        (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:
        See Attached Allegations

15.  Defendant  ___Warden, FCI Lompoc___ resides or works at
                   (full name of first defendant)
        ___Federal Correctional Institution, 3600 Guard Road, Lompoc, CA 93436___
        (full address of first defendant)

        (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual  ☒ official capacity.

Explain how this defendant was acting under color of law:
        See Attached Allegations

on (date or dates) ___beginning May 2010, through December 2016.___, _____.
                      (Claim I)              (Claim II)            (Claim III)

NOTE:    You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

16.  Defendant  ___Dr. Gross, M.D._____ resides or works at
                  (full name of first defendant)

       ___Federal Correctional Institution, 3600 Guard Road, Lompoc, CA 93436___
       (full address of first defendant)

       _____
       (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:
        ___See Attached Allegations_____
_____
_____

17.  Defendant  ___Warden, FCI Terminal Island_____ resides or works at
                  (full name of first defendant)

       ___Federal Correctional Institution, 1299 S. Seaside Ave.,___ San Pedro, CA 90733
       (full address of first defendant)

       _____
       (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:
        ___See Attached Allegations_____
_____

18.  Defendant  ___DIANAssociates, Inc._____ resides or works at
                  (full name of first defendant)

       ___513 Benfield Road, Severna Park, Maryland 21146___
       (full address of first defendant)

       _____
       (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☒ individual   ☒ official capacity.

Explain how this defendant was acting under color of law:
        ___See Attached Allegations_____
_____
_____

**D. CLAIMS\***

CLAIM I

The following civil right has been violated:

Freedom from cruel and unusual punishment under the Eighth Amendment.  Inadequacy of medical care; deliberate indifference to serious medical needs of prisoner.  The unnecessary and wanton infliction of pain on the part of prison officials.  See Attachment for additional claims.

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

See Attached.

*\*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.*

| Plaintiff: | Case No: |
|---|---|
| VAHE SARKISS | CV 17-06866-VAP-(DEM) |

Supporting Facts:

Generally:

1.    At all times relevant hereto, the Defendants are either an employee of the United States Marshal's Service or the Bureau of Prisons, including Detention facilities ran by the BOP, or under contract to provide medical care to the detainees and/or inmates of the referenced facilities (Detainees and inmates collectively referred to as "inmates" herein).

2.    The Plaintiff, while legally committed to the care, custody, and control of either the United States Marshals Service ("USMS") or the Federal Bureau of Prisons ("BOP") and in custody under BOP confinement, had no control over or relating to the decision of medical service providers (i.e. Hospitals, Physicians), and was transported to their various designated contract medical service providers.

3.    The USMS and BOP Officers are responsible for accompanying inmates and their medical records to and from the medical provider.  The medical records are under sole control of the BOP, and available on the BOP computers for medical staff and others to see, review, follow orders, make notes, and provide treatment details, among other things, pertaining to the inmate's medical condition.

-10-

## INTRODUCTION

4.     In December 2016, the Plaintiff, while on Federal Home Confinement, obtained copies of his medical records from various BOP facilities where he was incarcerated, and other medical service providers.

5.     Upon review of these medical records, the Plaintiff discovered these claims, for which now support this Complaint.

## BACKGROUND

6.     The Plaintiff was arrested on federal charges in this district in 2009, and was released on bond. In May 2010, while out on bond, the Plaintiff fell in his backyard, injuring his back, requiring a 911 call to the Paramedics. The Paramedics rushed the Plaintiff to Henry Mayo Hospital in severe pain for emergency treatment. During the hospital examination, x-rays were taken of the Plaintiff's back. The radiologist revealed an anomaly on one kidney, and several ruptured lower discs in the Plaintiff's spinal column.

7.     This emergency triggered the Plaintiff's bond to be revoked immediately. The Marshals' arrived at the hospital to take the Plaintiff into custody without being treated for the emergency.

8.     Under severe pain, the Plaintiff was transferred with his medical findings (records) from Henry Mayo Hospital

to their contract hospital, White Memorial, where the Plaintiff was led to believe he was to receive emergency treatment for his back injury.

9.   However, the Plaintiff was being treated for pneumonia and not for the ruptured discs, or the kidney anomaly as documented in the Plaintiff's medical records.  He was later discharged from White Memorial and transported to the Metropolitan Detention Center, Los Angeles ("MDC").

10.  For the next two months, there was no treatment or pain medication prescribed, except for aspirin.  All of the Plaintiff's requests for treatment and pain medication were ignored pertaining to his back injury.

11.  In July 2010, the Plaintiff was admitted to White Memorial Hospital for back surgery, which was performed by Dr. Duncan.

12.  Upon the Plaintiff's discharge from the hospital, the Plaintiff contracted an infection which became a massive spinal infection, along with other complications from the surgery, and was then returned to MDC.

13.  The Plaintiff's post-surgical infection worsened, and the MDC Medical Staff ignored the severe infection until it became so bad that the Plaintiff was transferred back to White Memorial, where the area was opened and washed out. When the infection did not clear up, a CT Scan located a Stage

-12-

4 renal carcinoma.  The testing led to an October, 2010 biopsy, at which time the Plaintiff began chemotherapy and radiation treatment.  The Plaintiff was given 3-4 months to live.  The Plaintiff was discharged to hospice care.  During this time, the MDC Medical Staff refused to treat the Plaintiff's post-operative infection, because it was a waste of money.  Dr. Zhang, Dr. Abboy and White Memorial believed, without treating the infection, it was due to the metastatic cancer.

14.  On October 6, 2010, the Court released the Plaintiff on bail, and continued sentencing under the terms and conditions previously set in the January 26, 2010 Court's Order, with modifications, as the Plaintiff was in home hospice care. The infection went untreated, worsening.  Several 911 emergency calls were made by the Plaintiff, requiring medical attention. Unlike previously, the U.S. Marshals did not respond to the emergency calls or arrive at the hospital.

15.  In January 2011, and while still on bail, emergency surgery was performed by Dr. Chen at Huntington Memorial Hospital. The surgery revealed that the infection was caused by a small plate installed by Dr. Duncan that was not secured properly. During a follow-up visit, Dr. Chen and Dr. Satterthwaite told the Plaintiff that the cancerous kidney had to be removed, and the temporary hardware in the Plaintiff's back would be replaced with permanent hardware.

16.  The Plaintiff's kidney was removed in September/

-13-

October 2011 by Dr. Satterthwaite.  During the surgery, a
robotic arm operated by Dr. Satterthwaite slipped during surgery,
requiring an emergency procedure to save the Plaintiff's life.

17.  Dr. Chen performed back surgery in November 2011,
at City of Hope.  Dr. Chen found that two of the Plaintiff's
vertebrae had to be removed due to the damage caused by the
2010 infection.  Dr. Chen installed a new system of hardware
to hold the spine in place.  Two of the rods later broke when
the Plaintiff underwent Physical Therapy ordered by Dr.
Satterthwaite.  Dr. Chen and Dr. Satterthwaite concluded that
the broken rods could not be repaired, and advised the Plaintiff
to restrict his physical ability and "deal with the pain and
discomfort." Medical services were billed and paid by Medicare.

18.  In late 2012, Dr. Chen recommended spinal fusion
surgery.  The surgery was scheduled for June 2013.

19.  In February or March of 2013, the Plaintiff was in
a car accident resulting in the death of a pedestrian.  On
May 22, 2013, two weeks before the scheduled back surgery,
the Plaintiff's bail was revoked, and he was returned to the
custody of the U.S. Marshals.

20.  The surgery did not occur.  On September 16, 2013,
the Plaintiff was sentenced to 48 months in federal prison.
First, the BOP sent the Plaintiff to Big Springs, Texas.  The
BOP's part-time doctor at Big Springs reviewed his medical

records and determined that the Plaintiff could not be cared for there, as he needed back surgery.  The Warden made arrangements to promptly send the Plaintiff to a medical facility to meet his immediate needs.

21.   In February 2014, the Plaintiff was transferred to Lompoc, California.  There, the Plaintiff's condition worsened, at which time he was examined by a retired contract podiatrist.  No treatment was performed or planned.  Several weeks later, the Plaintiff was examined by a Physician's Assistant, and x-rays were taken.  The Plaintiff was not shown the x-rays, and no reason was given as to why he was in so much pain.  There was no indication as to how the Plaintiff was to be cared for.

22.   The Plaintiff continued to complain, requesting medical care, and something for the pain in his back.  He wanted the required surgery for his back injury.

23.   In July 2014, the Plaintiff was transferred to Terminal Island, allegedly to participate in the Drug and Alcohol Program.  Upon arrival, the Plaintiff immediately sought medical care for his back, and needed pain medication.  The Plaintiff was told that he needed to see the doctor before anything would be prescribed.

24.   It wasn't until August 2014 that the Plaintiff met with Dr. Castro at Terminal Island.  During the initial visit,

and while Dr. Castro reportedly was reviewing the Plaintiff's medical records and history, the Plaintiff presented a copy of a letter from Dr. Chen, recommending surgery. Dr. Castro told the Plaintiff that she would schedule him to see a specialist and prescribe pain medication.

25. Finally, in October 2014, the Plaintiff was examined by Dr. Delman, an orthopedic surgeon. Dr. Delman ordered a CT myelogram to assess the Plaintiff's nerve damage.

26. In January 2015, Dr. Castro told the Plaintiff that the CT myelogram was "scheduled," but there were "problems with the mobile service." The Plaintiff learned during the same month that the CT myelogram was not scheduled. The Plaintiff repeatedly sought help for his severe pain and worsening back problems from Mr. Aird, the Physician's Assistant assigned to the Plaintiff. Aird expressed irritation at the Plaintiff's persistent requests for treatment. Aird gave excuses and said he would increase the dose of the pain medication. Aird also told him numerous times that if he didn't like the way things were done, he should not have come to prison.

27. The Plaintiff fell in March 2015, and was taken to the Terminal Island Medical Unit. He was examined by Physician's Assistant Mr. Abril. Upon Abril's review of his medical records, he made an urgent referral to Dr. Delman, who saw the Plaintiff the next day, and ordered a CT myelogram and recommended immediate surgery. Plaintiff's vertebrae were unstable due to hardware failure.

-16-

28.   Through Abril, it was learned that no one, not Dr.
Castro nor Aird had made any effort to seek treatment, schedule
any testing, or refer for surgery, knowing the Plaintiff's
immediate medical needs.  Furthermore, Abril stated that the
Administration frowns upon the Medical Staff rushing to order
scans, diagnostics, surgeries, and other forms of treatment
and care.  When they do, it causes undue heat on the medical
staff, as they are instructed to "slow-play" the care and
treatment of inmates.  They are instructed to perform the minimum
services needed, because inmates do not deserve to receive
immediate attention.  Additionally, the BOP and Terminal Island
have an unwritten policy, custom, and procedure set forth by
the Administration, to put off treatment as long as possible,
because in some instances the inmate will die or be transferred,
saving the institution money.  When the Administration determines
there to be too much utilization, it usually results in that
inmate in order to prolong the treatment and/or care, putting
the burden on someone else.

29.   Abril, realizing the urgency and delays in the Plaintiff's
care noted in the medical records, pushed forward, seeking
that some form of immediate care be rendered.

30.   On April 27, 2015, and only because of Abril's
involvement, the Plaintiff was taken to Little Company of St.
Mary's Hospital for a CT myelogram.  The Plaintiff was advised
by Dr. Delman to make sure the Plaintiff requested pain medication
before undergoing the CT myelogram procedure, as it would be

-17-

very painful.  The Plaintiff noticed that Dr. Smith asked the
BOP Officer who transferred the Plaintiff to the hospital what
he was convicted of.  When Dr. Smith finished, he came next
to the Plaintiff, at which time the Plaintiff requested pain
medication before the procedure began.  Dr. Smith refused,
his demeanor hostile, threatening, combative and aggressively
rough towards the Plaintiff.  Dr. Smith told the Plaintiff
"he was deserving of pain."  Dr. Smith then inserted the needle
into the wrong location, sending volts of excruciating pain
throughout the Plaintiff's body.  On the second effort, Dr.
Smith struck nerves, causing another round of more intense
excruciating pain, and necessitating the assistance of 2 or
3 technicians or nurses to restrain the Plaintiff.  As he was
being restrained, Dr. Smith continued probing and stabbing
with the needle, cutting and damaging nerves, resulting in
the loss of bladder control and function in his foot.

31.  A second CT myelogram was ordered after the Plaintiff
was examined by a neurologist and orthopedic surgeon.  The
Plaintiff explained the horror he experienced with Dr. Smith
to Dr. Delman.  Dr. Delman reassured the Plaintiff that this
time, things would be different.  He ordered pain medication
to be given before the procedure, and another doctor would
perform the procedure.

32.  Despite Dr. Delman's promises, when the Plaintiff
arrived for the procedure, Dr. Smith was there once again to

-18-

perform the second CT myelogram. Once more Dr. Smith refused
to give pain medication as ordered. The Plaintiff endured
the pain during the procedure. The damage caused the Plaintiff
to have permanent bladder control issues, and loss of function
in his right foot, ankle, and toes.

33. On October 22, 2015, and with persistent back pain
and unable to stand straight, the Plaintiff was x-rayed at
Terminal Island. The results were reported to Dr. Zellman at
DIANAssociates, University of Maryland. The x-ray report stated
there was no hardware failure to the system installed surrounding
the Plaintiff's spine. Based on Dr. Zellman's report, Terminal
Island discontinued their treatment of the Plaintiff.

<u>ALLEGATIONS AGAINST DEFENDANTS</u>

34. The United States Marshal's Service ("USMS") and
the Federal Bureau of Prisons ("BOP") (sometimes collectively
referred to as "BOP") have a duty to prevent injury to people
in their custody, and to ensure that adequate medical care
is provided to people in their custody.

35. During the period from about May 2010 through
September 16, 2013, the Plaintiff was a "pre-trial detainee."
From September 16, 2013 through December 2016, the Plaintiff
was a convicted prisoner. In most cases, the BOP rendered
medical services and transportation to medical services to
these Defendants. The actions and inactions of the BOP through
their employees and/or contract medical service providers acted

-19-

in their course and scope of employment were that of deliberate indifference.  This is because BOP Staff[1] and those contractors intentionally withheld, delayed, denied access to the Plaintiff's serious medical needs (as a pre-trial detainee in violation of the Fourteenth Amendment's Due Process Clause).[2]  These same individuals interfered with the Plaintiff's medical needs ordered by the Plaintiff's doctors.  The repeated violations of these elementary principles of the cruel and unusual punishment clause of the Eighth Amendment established the government's obligation to provide medical care for those whom it is punishing by incarceration gives inmates cause of action under 42 U.S.C. §1983.

36.    Jan W. Duncan, M.D. ("Dr. Duncan") at all times relevant hereto, was either an employee or under contract to provide medical care to BOP inmates.

37.    Dr. Duncan in July 2010, had actual knowledge of the serious medical needs of the Plaintiff, and rendered surgical services to the Plaintiff in order to correct the back injury which occurred in May 2010, at White Memorial Hospital.

38.    The Plaintiff alleges that Dr. Duncan, because of cost and reimbursement concerns, chose a medically unacceptable

_____

1.   BOP Staff includes staff at the Metropolitan Detention
     Center, Los Angeles where the Plaintiff was a pre-trial
     detainee.
2.   Under the 14th Amendment, pretrial detainees (unlike convicted
     prisoners) cannot be punished at all, much less maliciously
     and sadistically.                -20-

course of surgery and disregarded the excessive risk to the Plaintiff's health.

39.   The Plaintiff developed an infection post-operatively and had persistent drainage for three (3) months, which caused wanton infliction of pain, and the Plaintiff being rushed to White Memorial Hospital.

40.   The post-operative infection was determined to be the result of Dr. Duncan not properly installing a small plate.

41.   As a result of the surgery, the Plaintiff's back problems worsened, causing wanton infliction of pain.  The Plaintiff's mobility became restricted.

42.   Ramadas Abboy, M.D. ("Dr. Abboy"), at all times relevant hereto was either an employee or under contract to provide medical care to BOP inmates.

43.   Dr. Abboy, while at White Memorial, had actual knowledge of the serious medical needs of the Plaintiff, and the harm caused by the infection.

44.   Dr. Abboy, in his decision to rely solely on the belief that the Plaintiff's infection was caused due to metatastic cancer, discharged the Plaintiff to hospice care without treatment or any medical proof that the infection was caused by cancer.

45.   Dr. Abboy's course of doing nothing in Plaintiff's

-21-

treatment, was medically unacceptable under the circumstances, which caused wanton infliction of pain and more emotional suffering, believing he was to die within 4 months from cancer.

46.   Dr. Abboy's course of treatment was affected by the BOP, because of costs associated with ongoing treatment.  The decision to put the Plaintiff in hospice care was a cost-saving effort influenced by the BOP, in total disregard of an excessive risk to the Plaintiff.

47.   The post-operative infection was the result of Dr. Duncan's improper installation of a plate in the Plaintiff's back.

48.   Hao Wei Zhang, M.D. ("Dr. Zhang"), at all times relevant hereto, was either an employee or under contract to provide medical care to BOP inmates.

49.   Dr. Zhang, while at White Memorial, had actual knowledge of the serious medical needs of the Plaintiff, and the harm caused by the infection.

50.   Dr. Zhang, in his decision to rely solely on the belief that the Plaintiff's infection was caused due to metatastic cancer, discharged the Plaintiff to hospice care without treatment, or any medical proof that the infection was caused by cancer.

51.   Dr. Zhang's course of doing nothing in the Plaintiff's

treatment, was medically unacceptable under the circumstances, which caused wanton infliction of pain and more emotional suffering, believing he was to die within 4 months.

52.   Dr. Zhang's course of treatment was affected by the BOP, because of costs associated with ongoing treatment.   The decision to put the Plaintiff in hospice care was a cost-saving effort influenced by the BOP, in total disregard of an excessive risk to the Plaintiff.

53.   The post-operative infection was the result of Dr. Duncan's improper installation of a plate in the Plaintiff's back.

54.   White Memorial Hospital ("White Memorial") at all times relevant hereto was under contract to provide medical care to BOP inmates.

55.   White Memorial, through its Staff Doctors, had knowledge of the serious medical needs of the Plaintiff, and the need to render medical services.

56.   White Memorial has an obligation and duty to ensure that its Medical Staff is competent, qualified, and available to render 24-hour care to BOP inmates.

57.   White Memorial has an obligation and duty to ensure its equipment, laboratory, and surgical units, among other things, are in working condition to prevent any mishap and infection.

-23-

58.   White Memorial is responsible for the overall quality of care, its outcomes in treatment, reporting of infections and their control, disciplinary actions against doctors and staff, reviewing utilization among other things, while ultimately responsible for treatment and care rendered in the hospital.

59.   White Memorial knew or should have known that Dr. Duncan chose a medically unacceptable course of surgery, and in doing so, disregarded the excessive risk to the Plaintiff's health and had a duty to ensure that the medical needs of the Plaintiff were met.

60.   White Memorial knew or should have known about the Plaintiff's post-operative infection, and had a duty to ensure that the medical needs of the Plaintiff were met.

61.   White Memorial knew or should have known that Dr. Abboy's and Dr. Zhang's reliance on a belief without any medical proof as to Plaintiff's infections were caused by cancer.

62.   White Memorial knew or should have known that Dr. Abboy's and Dr. Zhang's course of treatment was medically unacceptable under the circumstances, and they chose this course in conscious disregard of an excessive risk to the Plaintiff's health.

63.   Christopher Smith, M.D. ("Dr. Smith") at all times relevant hereto was either an employee or under contract to provide medical care to BOP inmates.

-24-

64.   On April 27, 2015, the Plaintiff was transported to Little Company of St. Mary's Hospital for a CT myelogram procedure to be performed by Dr. Smith.

65.   Dr. Smith had actual knowledge of the serious medical needs of the Plaintiff.

66.   The Plaintiff believed that because of his crime, he was being denied pain medication or sedatives before the procedure.  It is further believed that this would account for Dr. Smith's sudden hostile, threatening, combative and intentional aggressively rough actions, including statements that "he was deserving of pain."

67.   Dr. Smith's intentional roughness while putting the needle in the wrong location continued while conducting the procedure, which was unusually cruel.  Dr. Smith continued to needlessly probe and stab the Plaintiff with the needle, causing the wanton infliction of pain.

68.   Dr. Smith then called 3-4 others to restrain the Plaintiff as he then tried a second time inserting the needle, aggressively stabbing and probing, causing the wanton infliction of pain as he thrashed on the examination table.

69.   Dr. Smith's violent inserting of the needle, and the stabbing and probing in various locations, caused the loss of bladder control and function in his foot.

70.   Dr. Smith knew or should have known that his aggressive

acts against the Plaintiff would cause new damage.

71.  Dr. Smith knew or should have known that the cause of treatment chosen was medically unacceptable under the circumstances, and he chose this course in conscious disregard of an excessive risk to the Plaintiff's health.

72.  Providence Little Company of St. Mary Hospital ("Little Company of St. Mary") at all time relevant hereto was under contract to provide medical care to BOP inmates.

73.  Little Company of St. Mary, through its staff doctors, had knowledge of the serious medical needs of the Plaintiff and the need to render medical services.

74.  Little Company of St. Mary has an obligation and a duty to ensure its medical staff is competent, qualified, and able to render 24 hours care to BOP inmates.

75.  Little Company of St. Mary is responsible and has an obligation and a duty to ensure its doctors and staff report any unnecessary actions and document mishaps, error, or patient abuse.

76.  Little Company of St. Mary is responsible for disciplinary action due to patient abuse.

77.  Little Company of St. Mary knew or should have known that Dr. Smith chose a medically unacceptable course of performing the CT myelogram, and in doing so, disregarded the excessive

-26-

risk to the Plaintiff's health and had a duty to ensure that the medical needs of the Plaintiff were met.

78.   David Zellman, M.D. (Dr. Zellman") at all times relevant hereto was under contract to provide medical care to BOP inmates or through a contract with Defendant DINAssociates, University of Maryland, who is contracted with the BOP.

79.   Dr. Zellman had knowledge of the Plaintiff's serious medical needs when he rendered services.  He knew or should have known to look for hardware failure from a post-laminectomy-synd-lumbar radiculopathy.

80.   Dr. Zellman was sent the Plaintiff's x-rays to read. [See Attachmenmt 1].  The x-rays clearly show hardware failure. Yet Dr. Zellman stated in his report, and noted on the x-ray that there was no hardware failure.

81.   DINAssociates, Inc, University of Maryland ("DINAssociates") al all times relevant hereto, was under contract to provide medical services to BOP inmates.

82.   Dr. Zellman was employed or under contract with DINAssociates to provide medical services.

83.   DINAssociates  has an obligation and duty to ensure that its medical staff is competent, qualified, and available to render care to BOP inmates.

84.   DINAssociates, through staff doctors, had knowledge

of the serious medical needs of the Plaintiff, and the need to render medical services.

85. DINAssociates has an obligation and duty to ensure review of x-rays as part of their overall quality assurance program.

86. DINAssociates knew or should have known through its quality assurance and review of x-rays that Dr. Zellman chose a medically unacceptable course of diagnosis and disregarded the excessive risk to the Plaintiff's health.

87. Evelyn G. Castro, M.D. ("Dr. Castro") at all times relevant hereto, was either an employee or under contract to provide medical care to BOP inmates at Terminal Island.

88. Dr. Castro, beginning in July 2014, was responsible for the overall care and coordination of medical treatment for the Plaintiff at Terminal Island, and had actual knowledge of the serious medical needs of the Plaintiff.

89. Dr. Castro reviewed the Plaintiff's medical records and examined him in August 2014. The Plaintiff gave Dr. Castro a copy of the letter he prepared, explaining that the Plaintiff required immediate surgery to correct his back problem.

90. Dr. Castro told the Plaintiff that he would be scheduled to see a specialist immediately, and due to his worsening condition, she would increase his pain medication which she prescribed.

-28-

91.   Dr. Castro told the Plaintiff that she would schedule the corrective back surgery, but did not do so.

92.   Dr. Castro told the Plaintiff that he would be scheduled for various tests and procedures, but did not do so.

93.   Dr. Castro referred the Plaintiff to Mr. Marcus Aird, a Physician's Assistant at Terminal Island, to care for him.

94.   Dr. Castro is responsible for the overall quality of care, its outcome in treatment, supervision of Physician's Assistants, and the rendering of prompt care to the Plaintiff.

95.   Dr. Castro intentionally put off, delayed, withheld, and denied access to the Plaintiff's severe medical needs, causing his condition to worsen, resulting in wanton infliction of pain. These decisions were made by the Administration's influence on cost-savings.

96.   Dr. Castro knew or should have known that her choice was a medically unacceptable   course of treatment, and in doing so, disregarded the excessive risk to the Plaintiff's health, and had a duty to ensure that the medical needs of the Plaintiff were met.

97.   Dr. Castro failed to supervise and review the course of care and treatment, and allowed Mr. Aird to choose a medically unacceptable course of treatment, and in doing so, disregarded the excessive risk to the Plaintiff's health, and had a duty

to ensure that the medical needs of the Plaintiff were met.

98.   Marcus Aird, Physician's Assistant ("Mr. Aird") at all times relevant hereto, was either an employee or under contract to provide medical care to BOP inmates at Terminal Island.

99.   The Plaintiff was assigned to Mr. Aird for primary medical care, acting as a "gatekeeper."

100.   Mr. Aird had actual knowledge of the serious medical needs of the Plaintiff, and was responsible for care and treatment at Terminal Island and the need to render such care.

101.   Mr. Aird knew or should have known that the course of care and treatment was affected by Administration because of costs associated with ongoing treatment.  The decision to jeopardize the Plaintiff's health was a cost-saving effort in total disregard of an excessive risk to the Plaintiff.

102.   Mahesh Patel ("Mr. Patel") at all times relevant hereto was either an employee or under contract to administer, oversee, supervise, and manage the medical care to BOP inmates at Terminal Island.

103.   Mr. Patel, as Administrator of all the medical services provided at Terminal Islaand through its staff, had knowledge of the serious medical needs of the Plaintiff, and the need to render medical services.

104.   Mr. Patel had an obligation and duty to ensure that

its medical staff is competent, qualified, and available to render 24-hour medical care to BOP inmates.

105.  Mr. Patel is responsible for the overall quality of care, its outcome and treatment, reporting incidents, disciplinary actions against staff, quality assurance, and utilization, among other things.

106.  Mr. Patel knew or should have known that Dr. Castro's and Mr. Aird's course of treatment was medically unacceptable under the circumstances, and they chose this course in conscious disregard of an excessive risk to the Plaintiff's health.

107.  Mr. Patel influenced Dr. Castro and Mr. Aird to intentionally put off, delay, withhold, and deny access to the Plaintiff's severe medical needs, causing his condition to worsen, resulting in wanton infliction of pain.  This influence was solely based on cost-savings.

108.  The Warden at the Federal Correctional Institution at Lompoc ("Lompoc Warden") at all times relevant hereto was either an employee or under contract to the prison, and responsible for the medical care of the inmates' housing, clothing, programs, safety, and overall welfare of all prisoners, among other things.

109.  The Lompoc Warden makes and implements policy, directs its employees, contracts with vendors, and is responsible for its fiscal spending of the facility.

110.   The Lompoc Warden is made aware of health care needs of prisoners requiring medical services.  The Lompoc Warden, through its staff, had knowledge of the serious medical needs of the Plaintiff, and the need to render medical services.

111.   The Lompoc Warden has an obligation and duty to ensure that its medical staff is competent, qualified, and available to render 24-hour medical care to BOP inmates.

112.   The Lompoc Warden is responsible for the overall quality of medical care, its outcomes in treatment, reporting of conditions, utilization review, and quality assurance among other things pertaining to rendering medical services to inmates.

113.   The Lompoc Warden became personally aware of the Plaintiff's needs for medical treatment.

114.   The Lompoc Warden was aware that the Plaintiff's care was intentionally put off, delayed, withheld, and denied access to his severe medical needs, causing his condition to worsen, resulting in wanton infliction of pain.

115.   The Lompoc Warden has put in motion and implemented policies, customs, and procedures allowing Lompoc Medical Staff to become influenced by Administrative decisions made by the Warden to discourage prompt treatment, referrals to specialists, hospitalization, surgery, and diagnostic testing, among other medical services, in conscious disregard of an excessive risk to the Plaintiff's health in an effort to save money.

-32-

116.   The Lompoc Warden, by implementing these unwritten policies, procedures and customs, had intentionally deprived the Plaintiff under color of law of federally secured rights. In doing so, the Lompoc Warden disregarded the excessive risk to the Plaintiff's health, and caused wanton infliction of pain.

117.   The Warden at the Metropolitan Detention Center ("MDC Warden") at all times relevant hereto, was either an employee or under contract to the Detention Center, and responsible for the medical care, housing, safety, programs, and overall welfare of all inmates.

118.   The MDC Warden makes and implements policy, directs its employees, contracts with vendors, and is responsible for its fiscal spending of the Detention Center.

119.   The MDC Warden is made aware of health care needs of prisoners requiring services.

120.   The MDC Warden, through its staff had knowledge of the serious medical needs of the Plaintiff and the need to render medical services.

121.   The MDC Warden has an obligation and a duty to ensure that its medical staff is competent, qualified, and available to render medical services.

122.   The MDC Warden is responsible for the overall quality of medical care, its outcomes in treatment, reporting of conditions,

utilization    review, and quality assurance, among other things
pertaining to rendering medical services to inmates.

123.   The MDC Warden became personally aware of the Plaintiff's
need for medical treatment.

124.   The MDC Warden was aware that the Plaintiff's care
was intentionally put off, delayed, withheld, and denied access
to severe medical needs, causing his condition to worsen, resulting
in wanton infliction of pain.

125.   The MDC Warden has put in motion and implemented
policies, customs and procedures allowing MDC Medical Staff
to become influenced by Administrative decisions by the Warden
to discourage prompt treatment, referrals to specialists,
hospitalization, surgery, and diagnostic testing among other
services, in conscious disregard of an excessive risk to the
Plaintiff's health in an effort to save money.

126.   The MDC Warden, by implementing these unwritten
policies, procedures and customs, had intentionally deprived
the Plaintiff under color of law, of federally secured rights.
In doing so, the MDC Warden disregarded the excessive risk to
the Plaintiff's health, and caused wanton infliction of pain.

127.   The Warden at the Federal Correctional Institution
at Terminal Island ("TI Warden") at all times relevant hereto
was either an employee or under contract to the prison and
responsible for the medical care of the prisoners, housing,

-34-

clothing, programs, safety, and overall welfare of all prisoners, among other things.

128.   The TI Warden makes and implements policy, directs its employees, contracts with vendors, and is responsible for its fiscal spending of the facility.

129.   The TI Warden is made aware of health care needs of prisoners requiring medical services.

130.   The TI Warden, through its staff, had knowledge of the serious medical needs of the Plaintiff and the need to render medical services.

131.   The TI Warden has an obligation and duty to ensure that its medical staff is competent, qualified, and available to render 24-hour medical care to BOP inmates.

132.   The TI Warden is responsible for the overall quality of care, its outcome in treatment, reporting of conditions, utilization review and qualify assurance, among other things, pertaining to rendering of medical services to inmates.

133.   The TI Warden was aware that the Plaintiff's medical care was intentionally put off, delayed, withheld, and denied access to his severe medical needs, causing his condition to worsen, resulting in wanton infliction of pain.

134.   The TI Warden has put in motion and implemented policies, customs and procedures allowing TI Staff to become influenced

-35-

by Administrative decisions made by the Warden to discourage prompt treatment, referrals to specialists, hospitalization, surgery, and diagnostic testing, among other medical services, in conscious disregard of an excessive risk to the Plaintiff's health, in an effort to save money.

135.   The TI Warden, by implementing these unwritten policies, procedures and customs, had intentionally deprived the Plaintiff under color of law of federally secured rights. In doing so, the TI Warden disregarded the excessive risk to the Plaintiff's health, and caused wanton infliction of pain.

136.   Defendants "Jane/John Doe," ("Doe Defendants") are individuals whose identities are not presently known, but whose illegible signature(s) is/are contained in the medical records entries of the Plaintiff, who was/were an employee or either a contract health care provider at MDC, Lompoc, or TI, who provided care to the Plaintiff, and who at relevant times, had specific and actual knowledge of the Plaintiff's serious risk of serious harm, disregarded the risk of harm, amounting to deliberate indifference to serious medical need, in violation of federal law, and resulting in the damages more particularly set forth herein.

137.   That while the Plaintiff was in the care, custody and control of either MDC, Lompoc, or TI, he was denied necessary and adequate prescription pain medication as ordered, antibiotics and other supplies and medications for his serious

medical condition, causing wanton infliction of pain.

138.   The Doe Defendants at MDC, Lompoc, and TI, unreasonably discontinued the full dosages of prescription medication or changed the prescription ordered in the emergency department and/or by the Plaintiff's doctors, regarding substantial and foreseeable pain associated with the Plaintiff's obvious condition.

139.   That the unnecessary delays, acts, and/or omissions of each individual defendant were in wanton disregard of the Plaintiff's Constitutional right to be free from deliberate indifference to serious medical needs, including but not limited to access to qualified medical care/professional judgment without unreasonable delay, resulting in extreme physical and emotional pain and suffering; and the actions of the defendants were without regard to human dignity or presence, in violation of the provisions of the Eighth and Fourteenth Amendments to the United States Constitution.

140.   That the policies and procedures as set forth in MDC, Lompoc and TI are Constitutionally deficient, and furthermore, there are required policies which are simply absent, which have resulted in an obvious lack of adequate training and enforcement of what policy does exist.

141.   That as a direct and proximate result of the wrongful conduct of the Defendants as alleged herein, the Plaintiff

sustained unnecessary pain and suffering, including chronic
and delayed healing as a result of being deprived of prescription
medication, proper care and treatment, resulting in hospitalization
and surgery, mental anguish, medical expenses, and permanent
nerve damage, among other things.

142.    That pursuant to the provisions of 42 U.S.C. §1988,
the Plaintiff is entitled to recover fees, punitive damages,
and cost of litigation, as to the causes of actions alleged
under the Constitution and the Laws of the United States.

143.    Michael Chen, M.D. ("Dr. Chen") at all times relevant,
knew the Plaintiff was a detainee and subject to the Court's
jurisdiction, pre-trial services, and the U.S. Marshals.

144.    Dr. Chen, at all times relevant hereto, was either
an employee or under contract to provide medical care to BOP
inmates/detainees.

145.    Dr. Chen, in January 2011, had actual knowledge
of the serious medical needs of the Plaintiff, and rendered
surgical services to the Plaintiff to correct the back surgery
that was performed in July 2010, by Dr. Duncan.

146.    Dr. Chen found that the infection was caused by
an improperly served plate installed by Dr. Duncan.  Chen
installed temporary hardware to secure the Plaintiff's back.

147.    Dr. Chen determined Plaintiff's kidney was cancerous
and needed to be removed.  Dr. Chen referred the Plaintiff

to Dr. Satterthwaite.

148.   Roger Satterthwaite, M.D. ("Dr. Satterthwaite") at all times relevant hereto, knew the Plaintiff was a detainee and subject to the Court's jurisdiction, pre-trial services, and the U.S. Marshals.

149.   Dr. Satterthwaite had actual knowledge of the serious medical needs of the Plaintiff and diagnosed a cancerous kidney which Dr. Satterthwaite recommended be removed immediately.

150.   Dr. Satterthwaite, in September/October 2011, performed surgery to remove the Plaintiff's right kidney and chose to use a robotic device.  Dr. Satterthwaite, while operating the robotic device, slipped, nearly killing the Plaintiff.

151.   Dr. Satterthwaite knew or should have known to check the equipment before use, or that he had to be properly trained before use.

152.   Dr. Satterthwaite knew or should have known that the procedure he performed on the Plaintiff was a medically unacceptable course of treatment, and in doing so, disregarded the excessive risk to the Plaintiff's health, and had a duty to ensure that the medical needs of the Plaintiff were met.

153.   Dr. Satterthwaite chose a medically unacceptable course of surgery in September/October 2011 to remove the Plaintiff's kidney, and disregarded the excessive risk to the Plaintiff's health, causing the Plaintiff to nearly die.

154.   Dr. Chen, in November 2011, at City of Hope, performed surgery on the Plaintiff to remove two vertebrae and install a new hardware system he was unable to install because of Dr. Satterthwaite's unacceptable course of surgery in September/October 2011.

155.   Dr. Satterthwaite chose a medically unacceptable course of treatment when he ordered physical therapy and disregarded the excessive risk to the Plaintiff's health, causing the wanton infliction of pain.

156.   Dr. Chen and Dr. Satterthwaite concluded that the physical therapy caused broken rods and could not be repaired. Dr. Chen and Dr. Satterthwaite chose a medically unacceptable course of treatment and disregarded the excessive risk to the Plaintiff's health, causing the wanton infliction of pain.

157.   Dr. Chen, in late 2012, recommended spinal fusion surgery to correct the broken rods caused during physical therapy, resulting in the wanton infliction of pain.

158.   Huntington Memorial Hospital ("Huntington Memorial") at all times relevant hereto, knew the Plaintiff was a detainee and subject to the Court's jurisdiction, pre-trial services, and the U.S. Marshals.

159.   Huntington Memorial, at all times relevant hereto, was either an employee or under contract to provide medical care to BOP inmates/detainees.

-40-

160.   Huntington Memorial has an obligation and duty to
ensure that its equipment, laboratory, and surgical units,
among other things, are in working condition, in order to prevent
any mishap or injury to its patients.

161.   Huntington Memorial is responsible for the overall
quality of care, its outcome in treatment, reporting of infections
and their control, disciplinary actions against doctors and
staff, and reviewing utilization, among other things, while
ultimately responsible for treatment and care rendered in the
hospital.

162.   Huntington Memorial knew or should have known that
Dr. Satterthwaite chose a medically unacceptable course of
surgery, and in doing so, disregarded the excessive risk to
the Plaintiff's health, and had a duty to ensure that the medical
needs of the Plaintiff were met.

163.   Huntington Memorial knew or should have known that
Dr. Chen chose a medically unacceptable course of surgery,
and in doing so, disregarded the excessive risk to the Plaintiff's
health, and had a duty to ensure that the medical needs of
the Plaintiff were met.

164.   City of Hope, at all times relevant hereto, knew
that the Plaintiff was a detainee, and subject to the Court's
jurisdiction, pre-trial services, and the U.S. Marshals.

165.   City of Hope, at all times relevant hereto, was

either an employee or under contract to provide medical care to BOP inmates/detainees.

166.   City of Hope, through its Staff Doctors, had knowledge of the serious medical needs of the Plaintiff, and the need to render medical services.

167.   City of Hope has an obligation and duty to ensure that its medical staff is competent, qualified, and available to render 24-hour care to the community, including BOP inmates/detainees.

168.   City of Hope knew or should have known that Dr. Chen chose a medically unacceptable course of surgery, and in doing so, disregarded the excessive risk to the Plaintiff's health, and had a duty to ensure that the medical needs of the Plaintiff were met.

### E. REQUEST FOR RELIEF

I believe that I am entitled to the following specific relief:

The Plaintiff respectfully prays that this Honorable Court enter judgment in his favor and against the Defendants, jointly and severally, in an amount to be determined by the finder of fact, including costs, interest, fees, as well as punitive and/or exemplary damages.

_____          _____
        *(Date)*                            *(Signature of Plaintiff)*

                                      VAHE SARKISS